# EXHIBIT B

| | |
|---|---|
| DISTRICT COURT OF THE 2nd JUDICIAL DISTRICT, DENVER COUNTY DISTRICT COURT, STATE OF COLORADO<br><br>Court Address: 1437 Bannock Street<br>Denver, Colorado 80112<br><br>Phone Number: (720) 865-8301 | DATE FILED: June 19, 2017 9:35 AM<br>FILING ID: 31E4C28BF691C<br>CASE NUMBER: 2017CV32231 |
| Plaintiff:<br><br>**KYLYNN CLAYMON**<br><br>v.<br><br>Defendant:<br><br>**VICTORIA FIRE & CASUALTY COMPANY d/b/a NATIONWIDE** | ▲ Court Use Only ▲ |
| Plaintiff's Attorneys:<br><br>Kurt Zaner, Esq. #40989<br>Elliot Singer, Esq.  #47490<br>ZANER HARDEN LAW, LLP<br>1610 Wynkoop Street, Suite 120<br>Denver, Colorado 80202<br>Telephone: (303) 563-5354<br>Facsimile:   (303) 563-5351<br>E-mail:     kz@zanerhardenlaw.com<br>                   es@zanerhardenlaw.com | Case No.:<br><br><br>Division: |
| **CIVIL COMPLAINT AND JURY DEMAND** ||

The Plaintiff, Kylynn Claymon, by and through her undersigned attorneys, ZANER HARDEN LAW, LLP, hereby submits the following Civil Complaint and Jury Demand and asserts:

## JURISDICTION AND VENUE

1. At all times relevant to this action, Plaintiff Kylynn Claymon (hereinafter "Plaintiff") resided in Colorado.

2. Upon information and belief, at all times relevant to this action, Defendant Victoria Fire & Casualty Company d/b/a Nationwide (hereinafter "Defendant") was and is an Ohio corporation authorized to do business in the State of Colorado.

3. Venue is proper in the District Court of Denver County pursuant to C.R.C.P. 98(c), as Plaintiff resides in Denver County and Defendant is a nonresident of this state that may be found in Denver County.

## FACTUAL ALLEGATIONS

4. On or about September 7, 2016, Plaintiff entered into a contract for insurance on her automobile, a 2011 Mercedes C Class (hereinafter, "the Mercedes"), with Defendant, under Policy Number 010537282 (hereinafter, "the Policy").

5. The Policy included benefits for Comprehensive Coverage.

6. Under the Policy's Comprehensive Coverage, Defendant agreed to "pay for loss to [Plaintiff's] auto not caused by collision or upset."

7. Under the Policy, "loss" means "direct and accidental loss or damage to [Plaintiff's] auto."

8. Under the Policy, a "loss" included Plaintiff's Mercedes being stolen.

9. Under the Policy, if the Mercedes was stolen, Defendant agreed to reimburse her for her damages as a result of the theft.

10. Additionally, under the Policy's Comprehensive Coverage, Defendant agreed to "repay [Plaintiff's] travel costs after [Plaintiff's] auto was stolen."

11. On February 21, 2017, the Mercedes was stolen from the back driveway area of Plaintiff's residence at 4571 Grove Street, Denver, CO 80211.

12. On February 21, 2017, and immediately upon noticing that the Mercedes was stolen, Plaintiff called 911 to report the theft.

13. On February 21, 2017, and immediately upon noticing that the Mercedes was stolen, Plaintiff reported the theft to by telephone to Defendant.

14. During that call, Plaintiff asked Defendant to confirm that the Policy included comprehensive coverage and that this coverage would include theft.

15. Defendant confirmed that the Policy did include comprehensive coverage and that the Mercedes "would be covered."

16. After notifying the police and Defendant, Plaintiff gave a statement to investigating officers who reported to her address.



**EXHIBIT B**

17. On February 23, 2017, Defendant, through its authorized agent and employee, Christopher Hamner, called Plaintiff.

18. In this call, Defendant told Plaintiff "not to worry about anything."

19. Defendant, through Mr. Hamner, told Plaintiff that owned the same car and therefore "understood how upset [Plaintiff] was."

20. Defendant informed Plaintiff that the claims process would proceed "smoothly."

21. Defendant informed Plaintiff that the claims process would only "take 3 to 5 weeks."

22. On or about February 25, 2017, Defendant took the recorded statement of Plaintiff, which lasted approximately one half-hour.

23. In this statement, Plaintiff described what happened to the Mercedes, who had access to driving the Mercedes, her address, and other members of her household.

24. In this statement, Plaintiff truthfully and accurately answered all of Defendant's questions.

25. On or about March 1, 2017, Plaintiff completed all paperwork sent to her by Defendant and signed over the Mercedes's title to Defendnat, even though Defendant gave her no explanation as to why Plaintiff needed to sign away her title.

26. On or about March 2, 2017 Plaintiff's primary adjuster with Defendant, Mr. Hamner, went on a two-week vacation but failed to identify who would be handling Plaintiff's claim in his absence.

27. Defendant did not return any of Plaintiff's communications to Defendant in these two weeks, other than one communication in which Defendant informed Plaintiff to wait for Mr. Hamner's return.

28. On or about March 2, 2017, the Denver Police Department ("DPD) recovered Plaintiff's vehicle.

29. When DPD found the vehicle, the vehicle had been destroyed.

30. DPD notified Plaintiff that officers had observed a "young Hispanic male" wreck the car and then begin running towards North High School.

31. DPD informed Plaintiff that it was DPD's belief that local Mercedes dealerships were making extra copies of keys so that Mercedes vehicles could be stolen.

32. Plaintiff had never heard of and had no connection to the perpetrator who DPD identified as the individual who stole Plaintiff's Mercedes.

3

33.     Plaintiff's fiance, Mario Lombardi, similarly had never heard of and had no connection to the perpetrator who DPD identified as the individual who stole Plaintiff's Mercedes.

34.     Defendant has not set forth any concrete allegations connecting either Plaintiff or Mr. Lombardi to the perpetrator who DPD identified as the individual who stole Plaintiff's Mercedes.

35.     On or about March 14, 2017, and once he returned from his vacation, Defendant, through its authorized agent and employee Mr. Hamner, called Plaintiff.

36.     In this call, Plaintiff immediately informed Defendant that the Mercedes had been recovered, stated the perpetrator had been arrested, and gave Defendant all information it needed to communicate with DPD's detective assigned to the case.

37.     Defendant informed Plaintiff that as a result of this information, Plaintiff's claim should be settled by March 17, 2017.

38.     Defendant failed to both settle the claim or call Plaintiff by March 17, 2017.

39.     As a result, Plaintiff called and left voicemails for both Mr. Hamner and Mr. Hamner's manager, Nancy Pcionek.

40.     After leaving these voicemails, however, Plaintiff received a call from DPD informing her that Defendant's insurance company would be investigating Plaintiff for the theft of the Mercedes.

41.     On or about March 20, 2017, Defendant sent Plaintiff an e-mail stating that it was unable to communicate with her on March 17, 2017 because "its phones were down."

42.     On or about March 21, 2017, Plaintiff obtained copies of the DPD police reports and sent them to Defendant.

43.     That same day, Defendant again failed to return Plaintiff's communications but stated that it would do so soon.

44.     On or about March 21, 2017, Defendant informed Plaintiff that although the Mercedes was a total loss, because Defendant could not identify any signs of forced entry or ignition tampering, Defendant would be sending a "special investigator" to inspect the car and question Plaintiff.

45.     That same day, Plaintiff called Ms. Pcionek and stated her frustration at being investigated for a theft even though the perpetrator had been identified and arrested.

46.     However, on or about March 22, 2017, Mr. Hamner called Plaintiff and informed her that she had "nothing to worry about" while Defendant completed its due diligence.

4

47. At that time, Defendant implied that it would offer her at leaset $12,999 for the Mercedes but that it would likely increase this offer due to the vehicle's condition and options.

48. Defendant again promised to settle the claim by March 24, 2017.

49. On or about March 28, 2017, Defendant called Plaintiff informed her that its investigation was ongoing and that Plaintiff would need to participate in questioning by Defendant's special investigator.

50. Defendant informed Plaintiff that such questioning was "typical" and only needed to be completed to "wrap up the claim."

51. Defendant refused to inform Plaintiff what types of questions its special investigator would be asking her.

52. On or about March 30, 2017, Plaintiff met with Defendant's special investigator, Eric Conley, at a local Starbucks.

53. Defendant's special investigator proceeded to interrogate Plaintiff for approximately one hour.

54. Defendant's special investigator requested that, at the end of the interrogation, he be able to follow Plaintiff to her house and take pictures.

55. Defendant's special investigator proceeded to take pictures around Plaintiff's home and ask more questions to both Plaintiff and Mr. Lombardi.

56. Defendant's special investigator informed Plaintiff that he would be having a conference call with Mr. Hamner the next week, at which point the claim would be resolved.

57. On or about April 7, 2017, after not hearing from Defendant, Plaintiff filed a complaint with the Colorado Division of Insurance.

58. On or about April 11, 2017, Defendant called Plaintiff and informed her Defendant was denying her claim and rescinding the Policy.

59. Defendant informed Plaintiff that it was doing so because she had misrepresented the names of drivers in her household when applying for the Policy.

60. Later that day, Plaintiff spoke with Defendant's manager, Ms. Pcionek.

61. Ms. Pcionek failed to inform Plaintiff who made the decision to deny the claim and cancel the Policy.

62. However, Ms. Pcionek informed Plaintiff that Defendant believed that Plaintiff had some involvement in the Mercedes's theft.

5

63. Defendant alleged that the theft was instead a matter of "[Defendant's] word against [Plaintiff's]" and laughed when Plaintiff expressed frustrating about being told this statement.

64. Defendant then accused Plaintiff of lying on her application for insurance.

65. Plaintiff requested copies of all oral and written application for insurance, which Defendant refused to provide.

66. Plaintiff requested all copies or statements and other documents related to Defendant's investigation of the loss, which Defendant refused to provide.

67. On April 20, 2017, Defendant sent Plaintiff a copy of the Policy and its letters rescinding the Policy and denying the claim.

68. On April 20, 2017, Plaintiff again requested (1) her application for insurance; (2) all transcripts of recorded communications between Plaintiff and Defendant; and (3) all documents related to the denial of Plaintiff's claim.

69. Defendant refused to provide any of the requested documents because they were "[Defendant's] work product."

70. On May 3, 2017, Plaintiff informed Defendant that it disagreed with Defendant's characterization of the requested documents as "work product."

71. Plaintiff also asked Defendant to provide the basis for withholding such documents even though they formed the basis of denying Plaintiff's claim and rescinding the Policy.

72. Plaintiff also informed Defendant that she disputed most, if not all, of the statements noted in Defendant's letters rescinding the Policy and denying the claim.

73. On May 5, 2017, in response to Plaintiff's May 3, 2017 correspondence, Defendant simply informed Plaintiff that the documents requested were again "work product" and that it is Defendant's "policy that we are unable to provide them."

74. Under the Policy, Plaintiff, the insured, had a duty to provide Defendant with prompt notice of all losses and privde written proof of claim, if required.

75. Plaintiff notified Defendant of the loss hours after it occurred.

76. Under the Policy, Plaintiff, the insured, agreed to notify the police of all theft and vandalism losses as soon as practicable.

77. Plaintiff notified the police that the Mercedes was stolen as soon as she realized that the auto had been stolen.

6



78. Under the Policy, Plaintiff, the insured, agreed to submit to examinations under oath as often as reasonably requested by Defendant.

79. Plaintiff submitted to multiple examinations as requested by Defendant.

80. Plaintiff fulfilled all of her duties under the Policy.

81. As a direct and proximate result of Defendant's actions, Plaintiff incurred past and future economic expenses, losses and damages.

82. As a direct and proximate result of Defendant's actions, Plaintiff suffered in the past, and will continue to suffer in the future, non-economic damages including, but not limited to, pain and suffering, loss of enjoyment of life, inconvenience, emotional stress and impairment of quality of life.

## FIRST CLAIM FOR RELIEF
### Comprehensive Coverage Benefits

83. Plaintiff incorporates herein by this reference, the allegations contained in Paragraphs 1 through 82 of this Complaint, as if set forth *verbatim*.

84. At the time of the aforementioned collision, the Plaintiff qualified as an "insured" for purposes of a contract of insurance, the Policy, with Defendant.

85. The Policy included a provision for comprehensive coverage, which provides that Defendant will pay for damages sustained by Plaintiff in the event of a "loss" such as the Mercedes being stolen.

86. The Mercedes was stolen and, therefore, Plaintiff incurred a "loss" under the Policy and her Comprehensive Coverage.

87. Plaintiff has satisfied all conditions precedent under the Policy and she is eligible to recover Comprehensive Coverage Benefits under the Policy.

88. Defendant is liable for Plaintiffs' damages as described of as a result of the Mercedes being stolen and damaged.

## SECOND CLAIM FOR RELIEF
### Breach of Contract

89. Plaintiff incorporates herein by this reference, the allegations contained in Paragraphs 1 through 88 of this Complaint, as if set forth *verbatim*.

90. The Policy was in full force and effect on the date and time that Plaintiff suffered injuries in the aforementioned collision.

91. Defendant unreasonably failed to pay the Plaintiff's claims that were made pursuant to the applicable Policy.

EXHIBIT B

92. Defendant breached its contractual duty owed to Plaintiff.

93. Plaintiff is entitled to damages allowed by law for breach of contract against Defendant.

## THIRD CLAIM FOR RELIEF
### Unreasonable Delay/Denial of a Claim for Benefits
### Pursuant to C.R.S. §§ 10-3-1115-1116

94. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if set forth *verbatim*.

95. Defendant's delay and failure to settle Plaintiff's claims for benefits pursuant to the Comprehensive Coverage under the Policy was and is unreasonable and in violation of C.R.S. §§ 10-3-1115 & 10-3-1116 and includes, but is not limited to, the following:

   a. failing to settle Plaintiff's claim fairly and promptly when the Mercedes was stolen;
   b. repeatedly assuring Plaintiff that the loss "would be covered" when it, in fact, had no intention of fairly settling the claim;
   c. repeatedly assuring Plaintiff "not to worry about anything" when it was, in fact, investigating her for fraud;
   d. denying the claim and rescinding the Policy even though Plaintiff had complied with all of her duties under the Policy;
   e. allowing the primary adjuster on the claim to take a two-week vacation and not appointing a substitute to continue handling the claim in the adjuster's absence;
   f. other than one instance in which Plaintiff was told simply to wait for Mr. Hamner's return, failing to return any of Plaintiff's communications to Defendant during the primary adjuster's two-week vacation;
   g. failing to abide by its own timelines for communicating with Plaintiff;
   h. failing to return numerous communications from Plaintiff;
   i. failing to abide by its own timeline for settling the claim;
   j. failing to promptly request copies of the police report and requiring Plaintiff submit these on her own;
   k. looking for reasons to deny the claim, such as pointing out to Plaintiff that it could not identify any signs of forced entry or ignition tampering even though law enforcement authorities had apprehended, arrested, and charged another individual with the theft of the Mercedes;
   l. promising to pay a certain amount for the loss of the Mercedes but failing to do so;
   m. denying the claim, and doing so only after Plaintiff had filed a complaint with the Colorado Division of Insurance; and
   n. rescinding the Policy, and doing so only after Plaintiff had filed a complaint with the Colorado Division of Insurance.



96. Pursuant to 10-3-1116, C.R.S., Plaintiff is entitled to recover the covered benefit plus twice the covered benefit as well as attorney fees and costs from Defendant for the unreasonable delay and denial of her claim for underinsured motorist benefits.

### FOURTH CLAIM FOR RELIEF
#### Bad Faith

97. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 96 of this Complaint as if set forth *verbatim*.

98. Defendant owed Plaintiff a duty of good faith and fair dealing.

99. Defendant's actions as set forth above were unreasonable and Defendant knew its actions were unreasonable and/or recklessly disregarded the fact that its actions were unreasonable.

100. Defendant breached its duty of good faith and fair dealing and its covenant to act in good faith with regard to Plaintiff in the following ways, which include, but are not limited to:

a. failing to settle Plaintiff's claim fairly when the Mercedes was stolen;
b. failing to settle Plaintiff's claim fairly even when the perpetrator of the vehicle's theft was apprehended, arrested, and charged for stealing the Mercedes;
c. repeatedly assuring Plaintiff that the loss "would be covered" when it, in fact, had no intention of fairly settling the claim;
d. repeatedly assuring Plaintiff "not to worry about anything" when it was, in fact, investigating her for fraud;
e. denying the claim and rescinding the Policy even though Plaintiff had complied with all of her duties under the Policy;
f. failing to disclose the specific documents which supported Defendant's denial of the claim and rescission of the Policy;
g. allowing the primary adjuster on the claim to take a two-week vacation and not appointing a substitute to continue handling the claim in the adjuster's absence;
h. other than one instance in which Plaintiff was told simply to wait for Mr. Hamner's return, failing to return any of Plaintiff's communications to Defendant during the primary adjuster's two-week vacation;
i. implying that Plaintiff was either complicit in or had committed the theft of the Mercedes even after the perpetrator, who had no connections to Plaintiff, was apprehended, arrested, and charged for stealing the Mercedes;
j. failing to abide by its own timelines for communicating with Plaintiff;
k. failing to return numerous communications from Plaintiff;
l. failing to abide by its own timeline for settling the claim;
m. failing to promptly request copies of the police report and requiring Plaintiff to submit these on her own;
n. looking for reasons to deny the claim, such as pointing out to Plaintiff that it could not identify any signs of forced entry or ignition tampering even



**EXHIBIT B**

    though law enforcement authorities had apprehended, arrested, and charged another individual with the theft of the Mercedes;
o.  assigning a special investigator to the claim even though the perpetrator who stole the Mercedes and had no connection to Plaintiff had been apprehended, arrested, and charged for stealing the Mercedes;
p.  interrogating Plaintiff, and doing so in a public place, causing stress, anxiety, and humiliation to Plaintiff;
q.  interrogating Plaintiff's fiancé, Mr. Lombardi;
r.  insisting that the special investigator invade Plaintiff's privacy by following her to her home and taking pictures of the home;
s.  promising to pay a certain amount for the loss of the Mercedes but failing to do so;
t.  denying the claim, and doing so only after Plaintiff had filed a complaint with the Colorado Division of Insurance;
u.  rescinding the Policy, and doing so only after Plaintiff had filed a complaint with the Colorado Division of Insurance;
v.  laughing at Plaintiff when she expressed distress regarding the handling of her claim, its denial, and the rescission of her Policy;
w.  refusing to identify the specific employees involved in making the decision to deny the claim and rescind the Policy; and
x.  refusing to disclose critical documents related to the claim's denial and the Policy's rescission without pointing to any authority, either legal or in the Policy, by which Defendant could refuse to produce the requested documents.

101.  As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic damages as described above.

## JURY REQUEST

Trial to a jury of six (6) is requested on all issues so triable.

**WHEREFORE,** the Plaintiff, Kylynn Claymon, prays for judgment against the Defendant, Victoria Fire & Casualty Company d/b/a Nationwide, in an amount to be determined by the trier of fact for her losses as set forth above and for costs, expert witness fees, filing fees, pre- and post-judgment interest, and such other further relief as the Court may deem appropriate, just and proper.

EXHIBIT B

Dated this 19th day of June, 2017.

                                        Respectfully submitted,

                                        ZANER HARDEN LAW, LLP


                                        */S/ Elliot Singer*
                                        Elliot Singer
                                        Kurt Zaner


Plaintiff's Address:
4571 Grove St.
Denver, CO 80211